UNITED STATES DISTRICT COURT
for the
NORTHERN DISTRICT OF NEW YORK

---

EVAN WARREN,

|                     | Plaintiff, |              |
|---------------------|-----------|--------------|
|             -v.-    |           | 9:09-CV-1146 |
|                     |           | (DNH/ATB)    |
| MICHAEL CORCORAN, *et al.*, |   |              |
|                     | Defendants. |            |

---

EVAN WARREN, Plaintiff *pro se*
C. HARRIS DAGUE, Assistant Attorney General, for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT and RECOMMENDATION

This matter was referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable David N. Hurd, United States District Judge.  Plaintiff alleges that defendants violated his rights under the Eighth and Fourteenth Amendments.  (Dkt. No. 1).  Plaintiff seeks significant monetary damages.  Presently before this court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56(b).  (Dkt. No. 33).  Plaintiff has not responded to defendants' motion.  For the following reasons, the Court recommends granting defendants' motion and dismissing the complaint in is entirety.

I.   **Background**

Plaintiff is an inmate in the custody and control of the New York State

Department of Correctional Services ("DOCS").[1]  (Compl. ¶ 1).  At all times relevant to the allegations in plaintiff's complaint, he was incarcerated at Cayuga Correctional Facility (Cayuga).  (Rule 7.1 Statement ¶ 2).[2]

Plaintiff alleges that Defendants violated his Eighth Amendment right to adequate medical care relating to plaintiff's abdominal pain, and infringed his Fourteenth Amendment right to privacy by disclosing his HIV-positive status to two correctional officers during medical appointments.  (Compl. ¶¶ 10–26).

## II.   Summary Judgment–Legal Standards

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56[3]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990).  "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987)

---

[1] On April 1, 2011, DOCS and the New York State Division of Parole were merged into one agency, named the New York State Department of Corrections and Community Supervision. Because the events relevant to this suit occurred before the merger, I will refer to New York State's corrections agency as "DOCS."

[2] More recently, he was incarcerated at Southport Correctional Facility and Clinton Correctional Facility.  (Stmt. Pursuant to Local Rule 7.1(a)(3) (Rule 7.1 Statement) ¶ 1, Dkt. No. 34; Notice of Change of Address, Dkt. No. 35).

[3] Rule 56 was extensively amended, effective December 1, 2010.  As the Advisory Committee Notes indicate, "the standard for granting summary judgment remains unchanged."  The revised rule explicitly adopts procedures relating to summary judgment motions "consistent with those already used in many courts."

(citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56 (c)(1)(A). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48.

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan v.*

3

*Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (citing, *inter alia*, *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (a court is to read a *pro se* party's "supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest")).[4]  "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## III.   Deliberate Indifference to Medical Needs

### A.   Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is

---

[4] In this case, although plaintiff received proper notice of his obligation to respond to defendant's motion in accordance with Local Rules (Dkt. No. 33-1), the plaintiff did not file a statement of undisputed material facts, or any other responsive papers, as required by Local Rule 7.1(a)(3).  Consequently, the court may accept the properly supported facts contained in the defendant's Rule 7.1 statement (Dkt. No. 34) as true for purposes of this motion.  *Govan v. Campbell*, 289 F. Supp. 2d at 295–96.  Nonetheless, the court will carefully review the entire record in determining if there are any material facts in dispute.

subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.'" *Bellotto v. County of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id*. at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange*, 248 F. App'x at 236 (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter*, 316 F.3d at 187

(actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).  A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose  of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference.  *Id*. at 835, 837.  The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan*, 511 U.S. at 844.  Thus, the court stated in *Salahuddin*, that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 28.

A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong*, 143 F.3d at 703.  Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative

6

treatment, support a constitutional claim.  *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir.1986)).  Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference.  *Farmer v. Brennan*, 511 U.S. at 835.  Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983.  *Ross v. Kelly*, 784 F. Supp. 35, 44–45 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (table).

**B.      Application**

Plaintiff argues that defendants were deliberately indifferent to his serious medical needs while he was an inmate at Cayuga in 2007.  (Compl. ¶¶ 10–21).  Plaintiff alleges that on January 22, 2007, correctional officers found him on the floor of his cell complaining of severe pain, nausea, and vomiting.  (Compl. ¶ 11).  Plaintiff was taken to Cortland Regional Medical Center, where Dr. Theresa Whitt[5] diagnosed plaintiff's abdominal pain as secondary to constipation.  (Compl. ¶ 12).  The Ambulatory Health Record Progress Note (AHR)[6] dated January 22, 2007, indicates that plaintiff was sent to the emergency room after he was found "writhing on bunk in distress."  (Keiser Aff. Ex. A p. 15).  The AHR dated January 23, 2007, indicates that an abdominal x-ray

_____

[5] Dr. Whitt is not a named defendant in this action.

[6] The AHR is a DOCS document in which an inmate's medical care is recorded, based on the date of the services.

showed constipation, and plaintiff was prescribed laxatives, told to increase his fluid intake, and to report any increased abdominal pain.  (Keiser Aff. Ex. A p. 15; *see also* Keiser Aff. Ex. B).  The AHR dated January 23, 2007, indicates that plaintiff stated he was feeling "better," and an AHR for later the same day indicates that plaintiff had bowel sounds in all four quadrants, appeared to be in no apparent distress, and that plaintiff denied having abdominal pain.  (Keiser Aff. Ex. A p. 15).

For the next four months, plaintiff alleges his condition failed to improve. (Compl. ¶ 13).  Plaintiff alleges that he continued to report his symptoms by signing up for sick call, or report them when he received his medication from defendants Registered Nurse Crull and Registered Nurse Burgin.  (Compl. ¶ 13).  Plaintiff's AHR for January 24, 2007, indicates plaintiff denied any pain or discomfort, and he stated that he felt "okay."  (Keiser Aff. Ex. A p. 14).  Plaintiff's AHR for January 29, 2007, states that he requested medication for a cold, and made no mention of any abdominal symptoms.  (Keiser Aff. Ex. A p. 14).

Plaintiff's AHR entries for February 1, 7, 10, 20, and 28, 2007, indicate that plaintiff reported that he was not eating well, had chapped lips, a dry throat, and was concerned about his weight, but the entries do not mention any complaints of abdominal pain.  (Keiser Aff. Ex. A pp. 12–14).  Plaintiff's AHR entries for March 6, 17, 22, and 31, 2007, indicate that plaintiff wanted information on his prescriptions and

8

was concerned about his weight loss, but they do not indicate plaintiff complained of any abdominal pain.  (Keiser Aff. Ex. A pp. 11–12).

In April 2007, plaintiff alleges that he complained to Nurse Crull that his condition had worsened since January, and he had severe abdominal pain, headache, and a fever.  (Compl. ¶ 14).  Plaintiff alleges that Nurse Crull did not examine plaintiff, but scheduled plaintiff with the doctor and prescribed Motrin or Tylenol.  (Compl. ¶ 14).  Plaintiff alleges that the Motrin and Tylenol did not relieve his symptoms, which worsened over the next month.  (Compl. ¶ 14).

Plaintiff's AHR entries for April 12 and 16, 2007, do not indicate plaintiff complained of abdominal pain.  (Keiser Aff. Ex. A p. 10).  Plaintiff's AHR entry dated April 23, 2007, indicates that he complained of stomach pain, and Nurse Biggar's impression was that plaintiff was suffering from constipation.  Plaintiff was prescribed Tylenol and Colace[7] and instructed that he should contact medical personnel if he did not have a bowel movement by the next morning or if symptoms worsened or persisted.  (Keiser Aff. Ex. A p. 10).  Nurse Crull stopped by plaintiff's cell the next day to encourage plaintiff to drink more water.  (Keiser Aff. Ex. A p. 9).  Nurse Crull noted that plaintiff stated, "I am," and Nurse Crull wrote on the AHR: "continue to monitor" plaintiff.  *Id.*

---

[7] A stool softener.  (*See* Keiser Aff. ¶ 16).

9

Plaintiff's AHR entries indicate that he was transferred out of Cayuga on May 3,

2007, and did not return until July 5, 2007.  (Keiser Aff. Ex. A pp. 7–9; *see also* Keiser

Aff. ¶ 18).  Plaintiff's AHR entries from Elmira Correctional Facility do not mention

abdominal pain or problems.  (*See* Keiser Aff. Ex. A pp. 7–9).  Plaintiff's AHR entries

indicate he returned to Cayuga around July 6, 2007.  (Keiser Aff. Ex. A p. 6).

Plaintiff's AHR entries for July 10 and 11, 2007, indicate that he complained of gas and

told the nurse that his last bowel movement was five days prior.  (Keiser Aff. Ex. A p.

5).  Plaintiff requested over-the-counter relief and was prescribed Simethacone, Colace,

and Dulcolax.[8]  *Id.*

Plaintiff's AHR entries dated July 21 and 22, 2007, indicate the plaintiff

complained of feeling weak, stomach pains, decreased appetite, and excessive sleep.

(Keiser Aff. Ex. A p. 4).  Plaintiff requested an appointment with a doctor, and he was

scheduled to meet with the doctor on July 23, 2007.  *Id.*

Plaintiff alleges that he saw defendant Dr. Keiser in July 2007, complaining of

severe abdominal pain, high fever, nausea, vomiting and loss of appetite, and that

plaintiff had been ill for over four months.  (Compl. ¶ 15).  Dr. Keiser examined

plaintiff on July 23, 2007, and the AHR indicates that Dr. Keiser noted that plaintiff

---

[8] Simethacone is used to treat gas, Colace is a stool softener, and Dulcolax is a laxative.
(*See* Keiser Aff. 19–20).

had restarted his HIV antiviral medications in March 2007.  (Keiser Aff. Ex. A p. 3; *see also* Keiser Aff. ¶ 22).  Dr. Keiser noted that plaintiff was alert upon examination, his vital signs were normal, an abdominal exam revealed nothing abnormal, but Dr. Keiser also noted that plaintiff's weight had dropped from 131 pounds to 113 pounds in one year.  (Keiser Aff. Ex. A p. 3; *see also* Keiser Aff. ¶¶ 22–23).  Dr. Keiser concluded that plaintiff's abdominal distress could be the result of the antiviral medication plaintiff was taking, so Dr. Keiser referred plaintiff to the infectious disease doctor for follow up via Telemed[9] conference call.  (Keiser Aff. ¶ 23).  Dr. Keiser prescribed Ensure, a meal supplement drink, and scheduled plaintiff for a weigh-in two weeks later to check if the Ensure was helping plaintiff's weight.  (Keiser Aff. ¶ 23; *see also* Keiser Aff. Ex. A p. 3).

Plaintiff alleges that the medication did not relieve his symptoms, and he saw defendant Registered Nurse Biggar later in July 2007.  (Compl. ¶ 16).  Plaintiff alleges that he told Nurse Biggar that he had severe abdominal pain, nausea, and vomiting, and plaintiff alleges that Nurse Biggar refused to examine plaintiff or provide any treatment.  (Compl. ¶ 16).  The AHR entry dated July 27, 2007,[10] states that plaintiff

---

[9] Telemed is a video conference system used for plaintiff to conference with his infectious disease doctor who was employed by DOCS at another facility.  (Keiser Aff. ¶ 24).

[10] The AHR entry is actually dated "7/27/06," but this appears to be inadvertent, as the dates of the other AHR entries on the same page are 2007, and Nurse Biggar's notes refer to a 7/27/07 date.  The court assumes the date of the AHR entry was actually July 27, 2007.

complained of vomiting and told the nurse he had a history of intermittent nausea and vomiting, secondary to taking antiviral drugs.  (Keiser Aff. Ex. A p. 3).  Nurse Biggar also noted that plaintiff stated that he was "peeing and pooping normal," with his last bowel movement being that same day.  *Id.*  Nurse Biggar also noted that plaintiff was eating dinner when she reached plaintiff's cell, and she instructed him to drink plenty of fluids and take his medication as directed.  *Id.*  Plaintiff had a doctor's appointment scheduled for August 2, 2007.  *Id.*

Nurse Crull saw plaintiff on July 28, 2007, and noted on the AHR that plaintiff was complaining of severe vomiting, stating that it was occurring every other day.[11]  *Id.* Nurse Crull also noted that plaintiff was in no apparent distress, did not have a fever, and had an appointment with his infectious disease doctor on July 31, 2007.  *Id.*

On July 30, 2007, plaintiff alleges that correctional officers found him on the floor of his cell complaining of severe pain and vomiting.  (Compl. ¶ 17).  Plaintiff's AHR entries indicate that a physician, via Telemed, instructed that plaintiff be taken to the emergency room.  (Keiser Aff. Ex. A p. 2).  Plaintiff was taken to Cortland Regional Medical Center, where he was diagnosed with a small bowel obstruction and possible intussusception.  (Keiser Aff. Ex. F).  Plaintiff was scheduled for exploratory surgery on July 31, 2007.  (Keiser Aff. Ex. F).  Plaintiff's AHR entry dated August 7, 2007,

---

[11] Nurse Crull used the abbreviation "q.o.d.," a medical abbreviation for every other day.

indicates that a benign tumor was removed, plaintiff was doing well, and the suture line was intact.  (Keiser Aff. Ex. A p. 1).

As detailed above, every time plaintiff had health issues, he received medical care.  In January, he was taken to the emergency room and diagnosed with constipation. He was given laxatives and other medication, and the next day plaintiff said that he was feeling better.  Plaintiff was seen by medical staff nine times in February and March 2007, getting treatment for numerous concerns, none of which were abdominal pain.

In April, plaintiff again had abdominal pain, and Nurse Biggar gave him Tylenol for his pain and a stool softener.  Nurse Crull followed up the next day and encouraged plaintiff to drink plenty of water, and noted that he would be monitored.  Plaintiff received medical care for his complaints.

When plaintiff returned to Cayuga in July, he was again treated when he complained of abdominal pain, as evidenced by the AHR entries discussed above.  Dr. Keiser examined plaintiff and concluded that plaintiff's weight loss, but "unremarkable physical examination," could be caused by plaintiff's antiviral medication.  (*See* Keiser Aff. ¶ 23).  Dr. Keiser referred plaintiff to the infectious disease doctor for follow up and prescribed a meal supplement.  Dr. Keiser apparently shared this conclusion with plaintiff, because plaintiff told Nurse Biggar that he had a history of intermittent nausea and vomiting, secondary to taking his antiviral medication.

Defendants did not withhold care from plaintiff or delay his treatment.[12]  Every time plaintiff complained of abdominal pain, he received treatment.  Plaintiff used sick call effectively, and received care when he requested it.  He obtained treatment for what the medical staff diagnosed as constipation, with varying degrees of success, as evidenced by the AHR entries for the relevant time period.  It may have taken the medical personnel until July 2007 to diagnose a small bowel obstruction and perform surgery, but even if defendants' delay in diagnosis could be considered negligence[13], it would not rise to the level of a constitutional violation, and the undisputed facts in the record do not support a finding of deliberate indifference.[14]  No issue of fact exists as to whether defendants were deliberately indifferent to plaintiff's serious medical needs.

---

[12] Plaintiff's conclusory claims to the contrary, which are flatly contradicted by medical records documenting the care he received, are insufficient to create a material issue of fact with respect to his claims of deliberate indifference.  *See, e.g.*, *Benitez v. Pecenco*, 92 Civ. 7670, 1995 U.S. Dist. LEXIS 10431, 1995 WL 444352 at n.5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) *(citing Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")); *Brown v. White*, 9:08-CV-200, 2010 U.S. Dist. LEXIS 23818, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record).

[13] This court makes no such finding.

[14] *See, e.g., Estelle v. Gamble*, 429 U.S. at 107 (considering the extensive scope of medical care provided to inmate plaintiff in finding that his claim that "more should have been done by way of diagnosis and treatment" may have indicated medical malpractice, but failed to state an Eighth Amendment cause of action).

14

Accordingly, defendants should be granted summary judgment as to plaintiff's medical indifference claims.

## VI.   <u>Disclosure of Medical Information</u>

### A.   Legal Standards

The Due Process Clause of the Fourteenth Amendment protects inmates from the unwanted disclosure of health-related information, such as an inmate's HIV status. *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994), *cited in Verley v. Goord*, 2004 WL 526740, 2004 U.S. Dist. LEXIS 857, at *60 (S.D.N.Y. Jan. 23, 2004). With respect to the "disclosure" of medical information, the court notes that an inmate's privacy right varies with the inmate's condition, with a greater interest in preventing the disclosure of highly sensitive conditions. *Webb v. Goldstein*, 117 F. Supp. 2d 289, 298 (E.D.N.Y. 2000). In *Rodriguez v. Ames*, the court also held that where the information is spread through "humor or gossip," it is more likely that the inmate's right to privacy will have been violated. 287 F. Supp. 2d 213, 220 (citing *Powell*, 175 F.3d at 112). Prison officials may impinge upon that right only to the extent that their actions are "reasonably related to legitimate penological interests." *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999).

### B.   Application

Plaintiff argues that during his Telemed appointments on June 13, 2009, and July

15

30, 2009, unnamed correctional officers remained in the examination room while he was discussing his retroviral medications with the infectious disease doctor.  (Compl. ¶¶ 22–23).  Because these correctional officers were in the room, plaintiff alleges that they became aware of plaintiff's HIV positive status.  *Id.*  Plaintiff claims that because Nurse Burgin and Nurse Johnson failed to order the correctional officers out of the room, they disclosed plaintiff's HIV status, violating his constitutional right to privacy under the Fourteenth Amendment.  *Id.* at 22–26.

During the time period in which the two alleged incidents occurred, plaintiff resided in S-Block, where inmates are housed for disciplinary reasons.[15]  (*See* Rich Aff. ¶¶ 7–8).  Due to the security concerns attendant to inmates in disciplinary housing, medical needs for S-Block inmates are treated in the inmate's cell, if possible.  If an inmate must go to the facility's medical unit, he is escorted by two or more correctional officers or sergeants.  (Rich Aff. ¶ 12).

The correctional officers who were present during plaintiff's Telemed appointments are considered part of the facility's HIPAA[16] "Health Care Component."[17]

---

[15] During this same time period, plaintiff's disciplinary history indicates infractions such as "flammable material," "interference," "direct order," "drug use," and "harassment."  (*See* Rich Aff. Ex. B).

[16] Health Insurance Portability and Accountability Act, 42 U.S.C. §§ 1320d–1320d-8.

[17] DOCS is a "Hybrid Entity" under HIPAA, or a legal entity that performs business activities that are governed by HIPAA as well as business activities that are not governed by

These transport and health unit correctional officers, as part of their duties, receive protected health information, and are held to stringent HIPAA guidelines protecting that information.  (*See* Rich Aff. ¶ 18).  These guidelines are the same for the nurses and doctors.  (*See* Rich Aff. Ex. C).  A Health Care Component may use protected health information for health care operations that are part of its treatment activities.  *See* 45 C.F.R. §§ 164.502(a)(1)(ii), 164.506(c)(2).  The Telemed appointment was an integral part of plaintiff's treatment, as only a physician, specializing in infectious diseases, could review and change retroviral medications.  *See* Keiser Aff. ¶ 24. Correctional officers were present in the room for security purposes during plaintiff's meeting with the infectious disease doctor via Telemed.  (*See* Rich Aff. ¶¶ 11–17).

Plaintiff does not allege that his health information was ever disseminated in any way to other inmates or staff, or that it was communicated through humor or gossip. This court does not find these incidents to be similar to those contemplated in *Doe* or *Powell*.  There was no direct disclosure by the nurses to the correctional officers, nor

---

HIPAA. 45 C.F.R. § 164.103. Under HIPAA, Hybrid Entities designate components of themselves that, if those components were separate legal entities, they would meet the definition of covered entities. 45 C.F.R. § 164.105(a)(2)(iii)(C). Here, the "covered entity" would be the DOCS medical unit or the "Health Care Component of DOCS."  DOCS has designated "Correctional officers and their relief and supervisors assigned to: Transportation[,] Health Units[, and] Mental Health Units" as part of the Health Care Component of DOCS. (Rich Aff. Ex. C). Health Care Components must comply with the disclosure requirements of HIPAA. 45 C.F.R. § 164.105(a)(2)(ii). Under HIPAA, a covered entity may not use or disclose protected health information, as defined by 45 C.F.R. § 164.105(a)(2)(i)(C), except as permitted by 45 C.F.R. § 164.502(a) or 45 C.F.R. §§ 164.302–.318. 45 C.F.R. § 164.502(a).

was it done for humor or as gossip, as described in *Rodriguez*.

The presence of the correctional officers served a legitimate penological interest: protecting prison personnel from potential threats.  *See Schuler v. Brown*, No. 07-CV-937, 2009 WL 790973, 2009 U.S. Dist. LEXIS 124791, at *34 (N.D.N.Y. February 2, 2009) (Lowe, M.J.) (adopted by *Shuler v. Brown*, 2009 WL 790973, 2009 U.S. Dist. LEXIS 23672 (N.D.N.Y. March 23, 2009) (McAvoy, S.J.) (holding that a counselor disclosing to a correctional officer that an inmate had behaved inappropriately toward her during a counseling session was legitimately related to penological purpose). Because of the heightened security threat posed by inmates housed in S-Block, there would be more security concerns in permitting such an inmate to be in close quarters with a civilian staff member in a facility medical unit.[18]  (*See* Rich Aff. ¶¶ 10–12). Thus, the correctional officers appropriately remained in the room with plaintiff and the nurse during plaintiff's Telemed appointment with the infectious disease doctor.  As part of the Health Care Component that included the nurses and doctors, the officers are also obligated to maintain the confidentiality of the inmate's medical information.

As discussed above, no infringement of plaintiff's privacy right occurred during the alleged incidents, and even if there were an impingement, it was legitimately related

---

[18] Deputy Superintendent Rich has personally witnessed security incidents in a facility's medical unit resulting in injury to medical staff, security staff, or inmates.  (Rich Aff. ¶ 17).

18

to a penological interest.  Accordingly, I recommend granting defendants summary judgment on this basis.[19]

## V.    Qualified Immunity

Defendants have asserted that they are entitled to qualified immunity in connection with some or all of plaintiff's claims.  In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001), modified by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory" in all cases).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  *Saucier*, 533 U.S. at 201.  This court need not address qualified immunity with respect to plaintiff's various causes of action because, as discussed above, he has not established any alleged violations of his constitutional rights.

**WHEREFORE**, based on the findings above, it is

---

[19] Plaintiff also includes Superintendent Corcoran in his confidentiality claim, alleging that Superintendent Corcoran created the policy that "authorizes correction[al] officers to obtain confidential HIV-related information in the course of providing health service[s] . . . ."  Because the court finds that plaintiff's confidentiality claim has no merit, it need not analyze whether Superintendent Corcoran was personally involved in the alleged violations of plaintiff's constitutional rights.

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 33) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: October 20, 2011

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**

20